IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SHERIE ASHANTI,
        Plaintiff,

v.                                                Civil Action No. 3:21cv494

CITY OF RICHMOND SCHOOL BOARD
d/b/a RICHMOND PUBLIC SCHOOLS,
        Defendant.

## OPINION

This matter comes before the Court on a motion for summary judgment filed by the defendant, Richmond Public Schools ("RPS"). (ECF No. 16.) The plaintiff, Sherie Ashanti ("Ashanti"), alleges RPS did not renew her probationary teaching contract beyond June 2021 due to race discrimination. Ashanti brings a Title VII claim under the Civil Rights Act of 1964 against RPS. The record shows that Ashanti lost her job because of her aggressive and argumentative conduct toward her superiors, her coworkers, and patrons of the Richmond Schools. RPS has shown that no genuine dispute of material fact exists as to Ashanti's Title VII claim, entitling RPS to judgment as a matter of law. The Court therefore grant RPS's motion for summary judgment.

## I. BACKGROUND[1]

RPS hired Sherie Ashanti, an African-American, on January 22, 2020, on a probationary basis, as a preschool teacher. (ECF No. 17, at 2.) RPS assigned Ashanti to Summer Hill Preschool. (*Id.*) Kelly Tobe, a Caucasian, began serving as the principal of Summer Hill Preschool in July 2020. (*Id.*; ECF No. 25, at 3.) RPS assigned Melody McCowin ("McCowin"), an African-American, as the Instructional Assistant ("IA") for Ashanti's classroom for the 2020-21 academic year. (ECF No. 17, at 2.)

Starting in September 2020, Ashanti began finding fault with McCowin. (*Id.* at 3.) On September 11, 2020, Ashanti forwarded Tobe a communication McCowin sent to parents that contained multiple mistakes. (*Id.*; ECF No. 17-5, at 1.) Tobe met with Ashanti and McCowin on September 14, 2020, to address Ashanti's concerns. (ECF No. 17, at 3.) Later in October, Briana Forbes ("Forbes"), the parent of a child in Ashanti's class, raised concerns about how Ashanti had treated her child. (*Id.*) On October 15, 2022, Tobe held a meeting with Ashanti and Forbes concerning an incident in which Forbes believed Ashanti had spoken sharply with Forbes's child. (*Id.*) After the meeting, Ashanti asked Tobe to remove Forbes's child from her classroom and

---

[1] As part of her opposition to the motion for summary judgment, Ashanti has filed a declaration. Federal Rule of Civil Procedure 56(c)(4) allows the use of an affidavit or declaration "to support or oppose a motion" but requires that it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Ashanti's declaration reproduces nearly verbatim multiple paragraphs from her opposition to summary judgment as well as her unverified complaint. (ECF Nos. 1, 25.) Throughout Ashanti's declaration, she makes assertions for which she has no personal knowledge. For example, Ashanti declares that she believes Summer Hill Preschool principal Kelly Tobe ("Tobe") and another woman (who Ashanti alleges made racist remarks to her) worked together, but she cites no basis for this allegation and no personal knowledge of this alleged fact. (ECF No. 25-1, ¶ 24.)

offered to take two students in the child's place; Tobe declined to make the transfer because Forbes did not want her child to move classrooms. (*Id.*)

By November 2020, Ashanti's trust in McCowin had eroded further. Ashanti sent an email to McCowin and two parents, asking for copies of all communication McCowin had sent to parents. (*Id.* at 3–4.) This email prompted a meeting on December 1, 2020, between Tobe, Ashanti, and McCowin to discuss the IA's role and responsibilities in the classroom. (*Id.*) The three met again the next day (December 2, 2020) after another email exchange. (*Id.* at 4.) Tobe told McCowin she did not need to prepare lesson plans and reminded McCowin that her role, as an IA, was to support Ashanti. (*Id.*) From that point onward, Ashanti began copying Tobe on emails Ashanti sent to McCowin and forwarding Tobe emails Ashanti received from McCowin. (*Id.*) Ultimately, Ashanti asked Tobe to remove Ashanti from Tobe's correspondence with McCowin and instead communicate directly with McCowin. (*Id.*) After more trouble in the classroom on December 15, 2020, Ashanti asked Tobe to reassign McCowin to a different teacher in the new year because Ashanti did not want to work with McCowin any longer. (ECF No. 17, at 4.) Tobe held a meeting with Ashanti, McCowin, and Linda Wood ("Wood"), the associate director for Early Childhood Education, on December 16, 2020, to review and outline expectations for the classroom. (*Id.* at 4–5.)

Ashanti's relationship with McCowin was confrontational, and she pestered the school administration with emails about minor classroom events. "On December 15, 2020, Ashanti informed Tobe that McCowin allowed a student to continue doing something during class that Ashanti had told him to stop." (Id.) Tobe eventually told Ashanti: "I have addressed all of your needs. I have met with you and your IA. We came up with guidelines. She has followed them.

3

You were relentless in finding ways in which she was breaching these. She has not.... I have upwards of five emails a day in which you state your needs." (ECF No. 17-29, at 1.)

The relationship between Ashanti and McCowin did not improve in the new year. In an email to Tobe, Ashanti accused McCowin of having an "inappropriate conversation with a parent during virtual class on January 8, 2021," and complained that McCowin called her "petty." (*Id.* at 5; ECF No. 17-18, at 3; ECF No. 17-19, at 1.) Tobe and Wood again met with Ashanti to discuss Ashanti's concerns; Tobe then issued a letter of counsel to McCowin. (ECF No. 17, at 5.) Ashanti again asked for a new IA; Tobe declined the request. (*Id.*) Three days later, on January 11, 2021, Ashanti "initiated a grievance" over the January 8 incident, but the grievance did not specify whether she intended to "grieve" McCowin or to "grieve" Tobe over her handling of the issue.[2] (*Id.*)

Matters came to a head on January 28, 2021. That day, during a meeting between Ashanti and McCowin, Ashanti began to berate McCowin. (*Id.*) McCowin recorded the encounter, in which Ashanti said, in raised tones:

> I don't know what your issues are. You need to go talk to Ms. Tobe because I'm not going to deal with you. I can't even explain something simple to you. You're a very disrespectful lady. I'm not putting up with you. I've been very tolerant, okay. You're a grown woman, you're not a kid. You should be able to understand a simple concept. Take the day off. Take many days off. I'm tired of you.

(*Id.* at 5–6; ECF No. 17-21.)[3] McCowin forwarded the video (the "McCowin video") to Tobe. (ECF No. 17, at 6.) That same day, Forbes emailed Tobe, Ashanti, McCowin, and RPS

---

[2] Because McCowin worked in a subordinate position to Ashanti, RPS's process did not permit Ashanti to grieve McCowin's conduct. (*Id.*) Ashanti's grievance did not progress beyond the initial stage. (*Id.*)

[3] Ashanti disputes this fact to the extent that it "impl[ies] or suggest[s] that the video at issue is a fully complete and fully accurate recording of the entire interaction that occurred between Ms. McCowin and Ms. Ashanti." (ECF No. 25, at 9.) The defendant received leave of this Court

4

Superintendent Jason Kamras ("Kamras") about an incident in the classroom the day before (January 27, 2021) in which she had found Ashanti had been "extremely rude and disrespectful" to Forbes. (*Id.*)

On January 29, 2021, Tobe met with Ashanti and Diane Holland ("Holland"), a "Senior Title IX and Anti-Bullying Specialist" with the RPS Talent Office, to discuss the McCowin video. (*Id.*) Ashanti admitted "she lost her temper." (*Id.*) In coordination with the Talent Office, Tobe prepared a formal letter of reprimand for Ashanti and scheduled a meeting with Ashanti, Wood, and Holland for February 3, 2022. (*Id.* at 7.) Forbes's complaint and the McCowin video formed the grounds for the reprimand; specifically, Ashanti's conduct in these two incidents "violated Performance Standard 6: Professionalism and School Board Policy 7–1.5 – Personnel – Statement of Ethics." (*Id.*) In the meantime, Tobe transferred Forbes's child to a different classroom and assigned McCowin to a different teacher.[4]

---

to file the video as an exhibit. The Court has reviewed the exhibit. (ECF No. 17-21.) It is clear the video picks up after McCowin and Ashanti's meeting began. The defendant notes that "Ashanti does not dispute that the video accurately depicts her treatment of McCowin on January 28, 2021." (ECF No. 26, at 4.) This kind of querulous quibbling runs throughout Ashanti's opposition.

[4] On February 1, 2021, Tobe emailed Ashanti and McCowin to inform them of the switch (Ashanti would receive a new IA as a result). McCowin replied all to the email. Ashanti accused McCowin of harassing her with the reply-all email and stated in an email to Tobe that "any further communications from Mrs. McCowin will be considered harassment from a legal standpoint." (ECF No. 17-26, at 5.) At this point, Kristi D'Souza ("D'Souza"), the Director of Early Childhood Education, interceded and admonished Ashanti for her unprofessional communication. (ECF No. 17, at 6.)

D'Souza wrote:

> Ms. Ashanti, I have been silently sitting by observing the communications you are sending on nearly a daily basis, sometimes multiple times a day, to your supervisor, Mrs. Tobe. My observations are that your communications are unprofessional and out of line.... I strongly encourage you to focus on your role as a teacher.

(ECF No. 17-26, at 5.)

On February 3, 2021, Holland, Wood, and Tobe met with Ashanti to present the letter of reprimand. (ECF No.17, at 7.) Ashanti became angry and accused Tobe of lying and "plotting against [Ashanti]." (*Id.*; ECF No. 17-29, at 1.) Ashanti accused Tobe of "seeking a position at Summer Hill so that Tobe could intentionally target [Ashanti]." (ECF No. 17, at 7.) Holland ended the meeting after Ashanti made threats against Tobe and Wade: "she told her principal and the associate director that if she went down, they would go down with her." (ECF No. 17-30, at 34:15–20.) [5]

Approximately an hour after the meeting concluded, Ashanti emailed Kamras. (ECF No. 17, at 8.) In the email, Ashanti accused Tobe of having a "political vendetta" against Ashanti. (ECF No. 17-32, at 1.) Ashanti then asserted that Wood and D'Souza "have joined Kelly Tobe as she uses KKK indoctrination tactics to destroy my career at RPS." (*Id.*)

Based on this email and Ashanti's conduct in the February 3, 2021, meeting, the RPS Talent Office recommended that "Ashanti be suspended with pay and terminated for cause because of her continued unprofessional behavior." (ECF No. 17, at 8.) Holland and Timothy Williams, the RPS Manager for Employee Relations, met with Ashanti to inform her of the suspension, the recommendation for her termination, and the reasons for the recommendation and suspension.

---

Ashanti replied:

> Good afternoon Mrs. D'Souza, I hope that you are having a great day. I am responding to your perplexing email alleging that I sent unprofessional emails to Kelly Tobe. Your email states that some of the alleged emails have been sent multiple times a day. In closing, I deny your accusation and ask that you please forward some of those emails to me or Dr. Jason Kamras for review.

(*Id.*)

[5] Ashanti disputes RPS's statement of these facts about the meeting only to the extent that RPS characterized her as "enraged" during the meeting. (ECF No. 25, at 9.)

6

(*Id.*) Ashanti later appealed the decision, but the parties did not conclude the hearing and reached no resolution. (*Id.*) Rather than begin a new hearing, Kamras and the RPS Talent Office decided to non-renew Ashanti's contract. (*Id.* at 9.)[6] Although Ashanti initially requested a meeting to challenge her non-renewal, she declined to schedule the meeting and forfeited her statutory rights. (*Id.*) The School Board met on May 17, 2021, and voted to non-renew Ashanti's contract. (*Id.*)

## II. <u>LEGAL STANDARD</u>

Under Rule 56 of the Federal Rules of Civil Procedure, the Court should grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because the standard asks whether any *genuine* disputes of material fact exist, the mere presence of *some* factual disputes does not defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation omitted)). "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* (quoting *Libertarian Party of Va.*, 718 F.3d at 313) (internal quotation omitted).

In deciding a summary judgment motion, the Court must draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255. "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Whitaker v. Nash-Rocky Mount Bd. Of Educ.*, 546 F. App'x 209, 210 (4th Cir. 2013) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Nevertheless, if

---

[6] Ashanti served as a probationary teacher, as defined by Va. Code § 22.1-303(A). The decision to non-renew a probationary contract does not require cause. Va. Code § 22.1-305(H).

7

the non-moving party fails to sufficiently establish the existence of an essential element to its claim on which it bears the ultimate burden of proof, the Court should enter summary judgment against that party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The Court does not consider "whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict" for the nonmoving party. *Anderson*, 477 U.S. at 251. As a result, merely showing the presence of some evidence in support of a claim does not allow the claim to survive summary judgment. *See id.*

### III. DISCUSSION

Title VII makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. §§ 2000e-2(a), (a)(1). A plaintiff may establish a Title VII claim for race discrimination in employment in one of two ways: through direct evidence of discrimination or by making a prima facie case of discrimination and showing the employer's proffered explanation is a pretext (the burden-shifting framework in *McDonnell Douglas*). *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004); *Rayyan v. Va. Dept. of Transp.*, 719 F. App'x 198, 201–02 (4th Cir. 2018).

The plaintiff asserts she can prevail on either basis. The Court disagrees.

#### *A. Direct Evidence*

A plaintiff can establish a Title VII claim for race discrimination by providing direct evidence of discrimination. "Direct evidence of discrimination is either direct evidence of a stated

8

purpose to discriminate, or circumstantial evidence of sufficient probative force to raise a genuine issue of material fact .... The plaintiff's 'own naked opinion, without more,' is not enough to establish a genuine issue of fact." *James v. City of Chesapeake*, 424 F. Supp. 2d 852, 856 (E.D. Va. 2005) (omission and alteration in original) (quoting *Demuren v. Old Dominion Univ.*, 33 F. Supp. 2d 469, 479 (E.D. Va. 1999)). A court may grant summary judgment for the moving party when a plaintiff "produce[s] no direct or circumstantial evidence of ... discrimination other than his own conclusory opinion." *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 847 (4th Cir. 1988) (affirming the district court's grant of summary judgment for the employer when the plaintiff presented only his opinion that his employer had discriminated against him on the basis of age). For Title VII purposes, the Court "treat[s] circumstantial and direct evidence alike." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003). "To overcome a summary judgment motion based upon direct evidence of discrimination, Title VII requires a plaintiff to produce evidence of a stated purpose to discriminate and a nexus between that evidence and [the] plaintiff's termination." *Rayyan*, 719 F. App'x at 203.

Ashanti argues that two alleged comments made by Tobe constitute direct evidence of discrimination. These comments were: "it must have been so hard for you to get [a master's degree]" and "[y]our people have done well." (ECF No. 25, at 7; ECF No. 25-1, ¶ 20.) "Ashanti understood [Tobe] to mean that it was hard for" Ashanti to get a master's degree "because she is African-American." (ECF No. 25, at 7; ECF No. 25-1, ¶ 20.) Ashanti "understood [Tobe's] use of the words 'your people' to be referring to African-Americans." (ECF No. 25-1 ¶ 20.) Ashanti alleges Tobe made these comments in the same conversation. (ECF No. 25, at 7; ECF No. 25-1, ¶ 20.) Ashanti does not state when this conversation occurred but explains that it happened "within a small eight-month window between the time Ms. Tobe began working at Summer Hill and the

9

time she recommended termination." (ECF No. 25, at 12.) Tobe denies making the "your people" statement. (ECF No. 17-4, 86:4–18.)

Similarly, Ashanti alleges, without evidence to support her claim, that "Ms. Tobe treat[ed] white and black teachers differently while she was employed at Summer Hill." (ECF No. 25, at 7.) "For example, on at least three occasions, Ms. Ashanti observed Ms. Tobe being overtly friendly and welcoming when talking to white teachers at Summer Hill ... By contrast, Ms. Ashanti often observed Ms. Tobe being serious and distant with black teachers at Summer Hill." (*Id.*) Ashanti provides no details, such as the dates and places where this conduct allegedly occurred. She identifies no other teacher – Black or white – who experienced this disparate treatment. This is critical because Ashanti's "conclusory opinion" that RPS discriminated against her on the basis of race "'without more,' is not enough to establish a genuine issue of fact." *Goldberg*, 836 F.2d at 847; *Demuren*, 188 F.3d at 479 (quoting *Goldberg*, 836 F.2d at 848).

Assuming *arguendo* that Tobe made these comments and showed friendliness or coldness to various people, and further assuming that these comments unambiguously betray racial animus, Ashanti's reliance on them fails as direct evidence of discrimination. Ashanti does not argue that the comments bear on the decision to non-renew Ashanti's contract. While racist statements or remarks can constitute direct evidence of discrimination if related to an employment decision, Fourth Circuit precedent remains clear that "a stray or isolated remark is not sufficient" to establish direct evidence of discrimination "and '[u]nless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of [discrimination].'" *Rayyan*, 719 F. App'x at 202 (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) (internal quotation omitted) (alteration in original)). Ashanti does not argue that Tobe made these remarks in relation to the employment decision.

In fact, Ashanti does not even allege that Tobe made the comments around the time of the adverse employment action. Perhaps they might show discrimination if Ashanti could show a temporal nexus between the comments and the adverse employment action. *Rayyan*, 719 F. App'x at 203. Ashanti's failure to establish the timing of these comments precludes such a finding. *Rayyan*, 719 F. App'x at 204 ("Given the isolated nature of [the supervisor's] alleged statements and the lapse in time between the comments and [the plaintiff's] dismissal, these statements are not direct evidence of discrimination." There, the plaintiff alleged his supervisor made discriminatory comments three weeks before his dismissal.). Even if the Court could find that the comments "directly reflect[ed] the alleged discriminatory attitude," Ashanti has not established a nexus between these comments or Tobe's cold demeanor and the decision to non-renew. (*Id.* at 202.) Ashanti apparently found things unpleasant at Spring Hill School. But "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." *Id.* at 203 (quoting *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 754 (4th Cir. 1996)). The Court finds no direct evidence of discrimination.

### B. McDonnell Douglas Burden-Shifting Test

To establish a prima facie case of wrongful termination under Title VII, a plaintiff must show that

> (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class.

*Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007).

The Fourth Circuit has noted that "the prima facie requirements are not set in stone, and 'differing factual circumstances may require adaptation.'" *Guessous v. Fairview Prop. Invs., LLC*,

11

828 F.3d 208, 219 (4th Cir. 2016) (quoting *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1999)). For the first prong, a protected class includes: "race, color, religion, sex, or national origin." 42 U.S.C. § 2002e-2(a)(1). For the second prong, "[a]n adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland*, 487 F.3d at 219 (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). For the third prong, "whether an employee has met h[er] employer's legitimate expectations at the time of termination depends on the 'perception of the decision maker … not the self-assessment of the plaintiff.'" *Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, 629 F. App'x 466, 469 (4th Cir. 2015) (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)). For the fourth prong, if the employer eliminates the terminated employee's position or leaves it unfilled, the plaintiff could be "required to show that her job duties were absorbed by employees not in the protected class or otherwise show that [the defendant] did not treat [the plaintiff's] protected characteristics neutrally when deciding to terminate her." *Guessous*, 828 F.3d at 219.

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to "articulate a non-discriminatory or non-retaliatory reason for the adverse action." *Id.* at 216. "[T]he burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." *Id.* The plaintiff can establish a pretext by showing that the defendant's proffered reason for firing her "is not worthy of belief." *Williams v. Staples, Inc.*, 372 F.3d 662, 669 (4th Cir. 2004). "When evaluating pretext, it is not within [the Court's] purview to question whether the employer's proffered basis for the disputed action 'was wise, fair, or even correct, ultimately, so long as it truly was the reason for' the action." *Ousley v. McDonald*, 648 F.

App'x 346, 349 (4th Cir. 2016) (quoting *Laing v. Fed. Express Corp.*, 703 F.3d 713, 719 (4th Cir. 2013)). Moreover, a plaintiff "alleging racial discrimination must show that the protected trait 'actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.'" *Id.* at 348 (quoting *Hill*, 354 F.3d at 286). Thus, "the plaintiff must 'show both that the reason advanced was a sham *and* that the true reason was an impermissible one under the law.'" *Id.* at 349 (quoting *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1235 (4th Cir. 1995)).

RPS does not contest Ashanti's status as a member of a protected class or that she suffered an adverse employment action. (ECF No. 17, at 12.) This narrows the Court's focus to the third and fourth prongs.

### *i. Meeting the Employer's Legitimate Expectations*

Ashanti received a letter of reprimand on February 3, 2021. (*Id.* at 7.) This letter clearly communicated to Ashanti that she did not meet RPS's legitimate expectations for employees. "The letter cited two incidents of unprofessional conduct ... and advised Ashanti that her conduct violated Performance Standard 6: Professionalism and School Board Policy 7–1.5 – Personnel – Statement of Ethics." (*Id.*) Ashanti does not dispute that she received the letter or that she understood the contents of the letter. (ECF No. 25, at 7, 9.) Accordingly, Ashanti had notice that her behavior and conduct did not meet her employer's legitimate expectations. At the February 3, 2021, meeting in which Tobe, Wood, and Holland presented the letter of reprimand, Ashanti accused Tobe of "plotting against her." (ECF No. 17, at 7.) Ashanti threatened Tobe and Wood.[7] Ashanti does not dispute these facts or introduce evidence to show a genuine dispute of material

---

[7] Holland interpreted Ashanti's remarks as threats: "if she was going down, they were doing down too." (ECF NO. 26-2, ¶ 14.) Ashanti does not dispute that she said those words. She argues over their interpretation. As noted above, the Court considers the employer's perception and "not the self-assessment of the plaintiff." *Jones*, 629 F. App'x at 469.

facts. (ECF No. 25, at 9; *see also* ECF No. 17, at 2–9.) Ashanti's objection that Tobe had not reprimanded her before February 3, 2021, misses the mark.[8] RPS showed a great deal of patience in dealing with Ashanti, despite her constant complaints and continuous picking at fellow employees. At the time RPS decided to suspend Ashanti, she had not met RPS's legitimate expectations and she knew this.[9] (ECF No. 17, at 7–8; ECF No. 25, at 9.) Accordingly, the Court finds no genuine dispute of material fact as to the third prong in the *McDonnell Douglas* framework.

### ii. *Whether the Position Remained Open or Was Filled by Someone Outside the Protected Class*

After Ashanti's suspension, RPS divided her students among the other Summer Hill preschool classrooms. (ECF No. 17, at 22.) Due to enrollment decreases, RPS reduced the number of Summer Hill classrooms in the 2021–22 school year and eliminated the open position. (ECF No. 17, at 22.) Ashanti does not argue otherwise and does not present any facts to show that the position remained open or that RPS filled it with someone outside the protected class. Accordingly, the Court finds no genuine dispute of material fact as to the fourth prong.

\*         \*         \*

---

[8] Ashanti asserts that "she had never been disciplined *before February of 2021*." (ECF No. 25, at 15 (emphasis added).) That is both true and immaterial when the question turns on whether Ashanti met RPS's legitimate expectations at the time RPS suspended her in February 2021.

[9] "Ashanti agrees that she was told of the purported reasons for the actions [that is, suspension and recommendation for termination] being taken." (ECF No. 25, at 9.) These reasons included "her 'unprofessional conduct,' which included threats made against her administrators… and her February 3, 2021[,] email to Kamras accusing her administrators of using tactics endorsed by the KKK." (ECF No. 17, at 8.) Ashanti "disputes the motives behind the actions taken against her," arguing these reasons were pretextual. (ECF No. 25, at 9.) The Court analyzes the pretext argument below.

14

The Court finds Ashanti fails to establish a prima facie case of race discrimination under the *McDonnell Douglas* burden-shifting framework. Ashanti has not established that she met RPS's legitimate expectations and apparently has abandoned any argument as to the fourth *McDonnell Douglas* prong.

### *iii. Pretext*

Even assuming arguendo that Ashanti could establish a prima facie case of race discrimination, the Court finds that RPS presents a legitimate nondiscriminatory reason for not renewing Ashanti's probationary contract and that Ashanti fails to establish RPS manufactured this reason as a pretext. As discussed at length above, RPS took disciplinary action following Ashanti's unprofessional conduct with McCowin and Forbes. *See supra Section III.B.i.* RPS presented a letter of reprimand on February 3, 2021, to Ashanti in a virtual meeting. Ashanti responded by accusing her immediate supervisor of plotting against her and by threatening her administrators. Following this meeting, Ashanti sent an email to Kamras, accusing Tobe of using "KKK indoctrination tactics" among other things. "[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989). Legitimate nondiscriminatory reasons for an adverse employment action include: "unprofessional and disruptive behavior" and "conflicts with persons in positions of authority." *Kelly v. Boeing Co.*, No. 1:16cv196, 2016 WL 7217661, at *4 (E.D. Va. Dec. 12, 2016); *Newel Ali v. BC Architects Eng'rs, PLC.*, No. 1:18cv1385, 2021 WL 2816016, at *8 (E.D. Va. May 28, 2021) (internal quotation omitted). "[A]nti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." *Sadeghi*, 251 F. Supp. 3d at 992 (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (4th Cir.

1999)). Courts do not act as "super-personnel department[s] weighing the prudence of employment decisions." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005). Ashanti bears the burden of proving that RPS's proffered reason for the non-renewal is a "sham" that "is unworthy of credence" and that the real reason is discrimination. *Russell*, 65 F.3d at 1235; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."); *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995). Ashanti does not meet her burden.

Ashanti introduces no evidence that calls into question RPS's credibility. She admits to her conduct in the McCowin video and concedes the accuracy of RPS's account of the February 3, 2021, meeting.[10] RPS has presented evidence that it found Ashanti's conduct unprofessional and that this unprofessional conduct led to the decision to non-renew Ashanti's probationary contract. Ashanti instead argues that "RPS had an extreme overreaction" and that "the actual reasons given to Ms. Ashanti for her discipline and termination (then non-renewal) were false and ... or illegitimate." (ECF No. 25, at 17.) As noted above, the Court does not insert itself into an employer's decision-making process to evaluate its wisdom or prudence. *See Anderson*, 406 F.3d at 272. The question turns on whether Ashanti's unprofessional conduct prompted RPS to take the adverse employment action. RPS asserts it did and provides deposition testimony from Kamras, Tobe, and Talent Office employees, as well as Holland's declaration. Ashanti introduces no evidence to create a genuine dispute of material fact.[11] Instead, she presents vague and

---

[10] *But see supra* note 6, in which Ashanti disputes that she was "enraged."

[11] In a typical response to RPS's motion for summary judgment, Ashanti mischaracterizes RPS's position and its description of her February 3, 2021, email to Kamras. She asserts the email "while colorful ... contained *no threats* whatsoever yet was falsely treated as if it did." (ECF No. 25, at 17 (emphasis in the original).) RPS does not allege that the email to Kamras contained

16

conclusory allegations that fail to rise above mere opinion. Accordingly, Ashanti cannot prevail on a claim of race discrimination under the *McDonnell Douglas* framework, and RPS is entitled to judgment as a matter of law.

### C. Cat's Paw Theory

If a plaintiff fails to establish a Title VII claim by direct evidence or the *McDonnell Douglas* test, she may still prevail under the cat's paw theory of liability. The cat's paw theory contemplates "the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 413 (2011). The Fourth Circuit has adopted the cat's paw theory of liability in employment discrimination and Title VII cases. *See Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 699 F. App'x 146, 155 (4th Cir. 2017) (applying *Staub* because it "relied on traditional agency principles to hold that the so-called cat's paw theory of liability is a possible means of holding employees liable for discriminatory conduct"); *Hill*, 354 F.3d at 289–90. The cat's paw theory requires a supervisor animated by animus who secures the employee's adverse employment action through a recommendation to the ultimate decision-making body, which acts only as a rubber stamp and conducts no independent investigation.[12] *Id.* (introducing the term "cat's paw" to employment discrimination law); *Smyth-*

---

threats; instead, it asserts: "Ashanti was informed that the action was being taken because of her 'unprofessional conduct,' which included threats made against her administrators on February 3, 2021, and her February 3, 2021[,] email to Kamras accusing her administrators of using tactics endorsed by the KKK." (ECF No. 17, at 8.)

[12] The *Staub* Court traced the origins and meaning of cat's paw:

The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by LaFontaine in 1679, and injected into United States employment discrimination law by Judge Posner in 1990 ... In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws

17

*Riding*, 699 F. App'x at 155 ("if a supervisor performs an act motivated by [unlawful] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable" (quoting *Staub*, 562 U.S. at 422) (alteration in original)). Conversely, when the decision maker does not act as a "mere rubber stamp, but ma[kes] an independent decision," there can be no employer liability. *Hill*, 354 F.3d at 288 (quoting *Shager*, 913 F.2d at 406).

To prevail on a cat's paw theory, Ashanti must establish a genuine dispute of material fact about (1) whether her supervisor, Tobe, harbored an unlawful animus; (2) whether Tobe performed an act intended to cause an adverse employment action; and (3) whether RPS merely rubber-stamped Tobe's recommendation. She fails to do so. Ashanti argues – without factual support – that Tobe "was the moving force behind the decision to terminate… [or] non-renew Ms. Ashanti's employment at RPS."[13] (*Id.* at 18.) This conclusory allegation misstates (and perhaps misunderstands) the necessary elements of the cat's paw theory. Ashanti identifies Tobe as "the person acting with illegal motives," but does not specify any action Tobe took to cause the adverse employment action. (*Id.* at 5.) Ashanti alleges she "was recommended for termination based on her comments to Ms. Tobe and others" and that "Kamras … pushed for [her] termination." (*Id.* at

---

in the process, the monkey makes off with the chestnuts and leaves the cat with nothing.

*Staub*, 562 U.S. at 413 n.1. In *Shager*, Judge Posner described a rubber-stamping committee as "the conduit of [the discriminating employee's] prejudice – his cat's-paw." *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).

[13] Ashanti's inconsistencies further undermine her argument. For example, she asserts that "Kamras, the white Superintendent of RPS, pushed for Ms. Ashanti's termination after she wrote to him to protest the discipline being issued against her," (ECF No. 25, at 6), and later argues that "as a result of Ms. Tobe's and Mr. Kamras'[s] actions and statements, RPS ultimately decided not to renew Ms. Ashanti's employment contract." (*Id.*)

18

6.) In the end, this becomes a muddle. Ashanti alleges Tobe had illegal motives but took no action and that Kamras may have taken action but had no illegal motives.

Critically, Ashanti provides no evidence to support her theory that the RPS Talent Office rubber-stamped any recommendation for an adverse employment action. RPS Talent Office employees participated in the February 3, 2021, meeting with Ashanti and witnessed Ashanti act unprofessionally and make threats. RPS had independent knowledge of Ashanti's conduct.[14] The Talent Office coordinated with Tobe and other school administrators on both the letter of reprimand and the decision to suspend Ashanti following the February 3, 2021, meeting. Though Ashanti criticizes RPS's decision to suspend her and ultimately non-renew her probationary contract, she introduces no evidence to support a theory of cat's paw liability. Accordingly, Ashanti cannot prevail under this theory, entitling RPS to judgment as a matter of law.

---

[14] Ashanti argues that because RPS did not present "competent testimony from either Ms. Holland or Ms. Lee" RPS Chief Talent Officer, the Court should "conclude that the record creates a genuine dispute of material fact about this issue." (*Id.* at 18.) The Court notes that "competent testimony" is a not a legal standard at summary judgment. Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.") RPS attached Holland's declaration in its reply brief. (ECF No. 26-1.) "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: … citing to particular parts of materials in the record, in the record, including depositions, documents, … affidavits or *declarations*." Fed. R. Civ. P. 56(c)(1), (1)(A) (emphasis added).

## IV. CONCLUSION

The Court finds that, based on the evidence before it, no genuine dispute of material fact exists and that RPS is entitled to judgment as a matter of law. Accordingly, the Court will grant RPS's motion for summary judgment. (ECF No. 16.)

An appropriate order will accompany this Opinion.

It is so ORDERED.

Let the Clerk mail a copy of this Opinion to all counsel of record.

Date: 30 January 2023
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge